et al, Erie County General Health District Board of Health et al. Arguments not to exceed 15 minutes for appellant, 15 minutes to be shared by the defendants. Ms. Finucane for the appellant. May it please the court, I'm Sandra Finucane and I'm here on behalf of Appellant John Whyde Jr and I've reserved 5 minutes for rebuttal. During his 2017 incarceration in the Erie County Jail, Mr. Whyde's rights under the 14th Amendment were violated by the defendants delivered indifference to his serious medical needs, which ended up in him being in critical condition on April 1, 2017 when the jail officers finally called an ambulance to take him to the hospital. In addition, his 14th Amendment rights were further violated when the county defendants used excessive force against him during a violent jail extraction where they violently extracted him from a jail with a takedown and placed him in a restraint chair, which was objectively unreasonable under the circumstances. Now, one of the issues in this case is that the district court actually used the wrong standard in deciding the plaintiff's deliberate indifference claims. This district court used a subjective standard instead of the objective standard that this court established in Brawner for pre-trial taintings. Does Lawler say Brawner doesn't apply to this situation? How do you deal with Lawler? In Lawler, that's a non-reported... No, it's published. Okay, was this subsequent? The Brawner... I'm sorry to interrupt you. I'll just tell you it was a 20, I think it's a 2024 case. I thought I printed it. It is a 2024 case. And it says that Brawner doesn't apply to situations that have... This was in 2017, right? Yes. And so Brawner is new, so it can't apply for clearly established. Okay, so for the summary judgment standard is different than... I'm distinguishing that from the qualified immunity and the clearly established prong of that. I mean, so... Wait, I mean... Okay, I'm not sure I follow. Maybe explain. Okay. I did, in passing, see those cases, they aren't cited here. But what I'm saying is that while the... For summary judgment purposes, Brawner applies in terms of the... Whether the subjective or the objective standard. That's exactly what Lawler's about. Well, that's about whether it's clearly established or not under the second prong. First, you have to determine whether there's summary judgment. It should be granted. And then, I mean, whether or not there's a constitutional violation. And the second issue being whether or not the law is clearly established. I believe that that case... But you can't grant summary judgment if it's not clearly established. You have to grant qualified immunity in that situation. Correct. Okay. And what you're saying is, it's the objective... I'm going to call them what you're calling them. The reckless disregard versus the subjective. Yes. The subjective standard, which requires them to have... And what Lawler says is the opposite. That's my easiest way of explaining it. Okay. Well, I would say to that this, that there are older cases that even... Let's apply the Eighth Amendment standard that they were previously applying. We have a plethora of cases. Richmond versus Huke, which is established in Murray. This court has decided that an inmate has a right to continue to receive their pre-existing medical treatment plan and not to have that interrupted. And that is clearly established. These were under Beretti. And these cases were decided under the... Using the Fourteenth Amendment under the Eighth Amendment standard that you're talking about. Can I ask you just a factual question just so... I just couldn't find this. Where... Is there record evidence, I assume there is, of an active prescription of Xanax? Yes, there was. The nurse did not look for... Where is it? Where in the record is what I'm saying? I'm sorry, I'm not... Okay. If I give you actual pages, there are... In the discovery, we produced the medical records and the ORS reports were produced and... The what reports? O-A-R-R-S, that's the database in Ohio where all controlled substances that are being prescribed to inmates, I mean to anyone, are there. And there was an active Xanax? Yes, there was an active high Xanax dose and high opioid dosages that were... Could have been accessed by the jail doctor as soon as he had seen Mr. Wyde had consented to treatment. That's part of it and Dr. Bauer testified to that. So anytime someone seeks a controlled substance, they're already consenting to have ORS accessed and that lists all controlled substances in all the pharmacies and all the dosages. So once Mr. Wyde apprised Burgess of this, she... Knowing the serious effects of an abrupt withdrawal, she should have put him on a sick call list or done something in order to ensure that he received that medicine or had the doctor look up the pharmacy if she couldn't find it. Now there's also a dispute about that because Mr. Wyde testified that he gave her several pharmacies, also told her about the Xanax prescription. It was also on the intake form and she didn't write down but one of the pharmacies in question. But in the Brawner case and also in the Richmond versus Hugh case, both involved similar situations where a medical provider, a nurse and a doctor didn't review the intake form or... Can I ask you, do prison doctors have any discretion to prescribe different treatment plan than outside doctors? In other words, if there's a policy of no OxyContin, so we're going to accomplish this by gabapentin, ibuprofen 800 and some other things, could they do that? Are they entitled to do that? Well, that's... It appears that that may be possible under some older cases, French versus Davies, if there's an independent evaluation and determination is made. But if they say, okay, here's what Oxy does, it relieves pain. The way we're going to relieve pain is a combination of gabapentin and ibuprofen 800 and some other things. Gabapentin's nerve right affects pain, ibuprofen 800. Here's how we're going to do it and comply with our jail's policy. Is it clearly established that they can't do that? Is it unconstitutional? It is unconstitutional to have... For them not to give a substitute plan? It's unconstitutional to have a complete ban. It's unconstitutional, it appears, under Bronner and Huke to do that, particularly in the absence of an independent evaluation by a doctor. This doctor didn't review his chart, didn't know his name. Okay, so give me a case. What case... Okay, Richman versus Huke. They're not even allowed to be tapered from these substances. Richman versus Huke. Bronner, the Bronner case... I wonder what Lawler, that Judge DePauw referred to earlier, tells us that it's the standard at the time of the events in question, not the later decided, not the Bronner decisions. A Bronner's not applicable here. Well, all of the cases in Murray, and I haven't read that case. I glanced at it and saw that it was establishing, for purposes of qualified immunity, saying that you have to show this different... But the cases that I'm relying on predate that. Bronner has not been overruled. I mean, Bronner... It doesn't apply. The standard pre-Bronner applies. Well, the standard required in Murray, in Richman versus Huke, which predates that, and Beretti versus Wiscombe, and a number of cases cited in there that an inmate is entitled to have the medications, their pre-existing plan, be continued. In Murray, in particular, that was a blood-thinning medicine, so... Right, but those aren't barred by the prison. In other words, OxyContin's barred by the prison. Here, in Richman, it's medical dressings and other things, not barred by the prison. What I'm asking is, do you have a right to get prescriptions that are barred by the prison? In other words, let's say an outside doctor prescribes marijuana for you. Can a prison override that because of their independent needs? If they independently evaluate the inmate and determine that he's able to receive that medication and it treats him effectively, that was not the case here. The substitute medications, the protocol that Mr. Wyden's put on, were obviously not effective. He was going into crisis and was deteriorating very clearly over a period of five days in the jail. He was hallucinating. He reported that to Sergeant Beatty. Burgess concluded that was because he wasn't taking his meds. But he wasn't taking his meds because he was paranoid that they were poisoning him. That was an effect rather than a cause. He was deteriorating on a daily basis. He was not eating. He refused his medication. He was exhibiting belligerence, hallucinations. And she recorded these things. And even when he was, he had his crisis on the first when he was out of his head during the jail extraction and she was summoned to the jail or asked or asked if she could come to the jail or asked what they should do. She did absolutely nothing. And she was there all but one day and only have like one nurse on duty at a time. She testified. There's not two. So she had a lot of interaction with him. She would have been able to observe that the protocols were not working for his high dosages of the opioids or the benzodiazepine that he was on. Counsel, do we have evidence on whose policy, assuming there was a policy not to allow the opioids, do we know whether it was the health district or the jail's policy? Well, it's the sheriff's, it's the health district's policy. In fact, they admitted that in discovery that they have a no opioid and a no benzo policy. But it's also the sheriff's policy because the sheriff stands in the position of the county and he adopted it, he adopted the policy, that the sheriff adopted the policy wholly of the health district. Okay, so you're saying that there's evidence that the sheriff adopted the policy. Separate and apart from any claim of acquiescence. Right, they just deferred, they completely went with the discretion of the health district, set the policy. And the sheriff went along, the sheriff in the Leach case held that the sheriff, if he accepts the health district's policy, he stands in their shoes. He can't, you know, that becomes also the policy of the sheriff. So you're not saying that the sheriff adopted it, you're saying that the sheriff acquiesced in it. Right, under Leach v. Shelby, he, well, it became his policy. You'll have your money back. Thank you. May it please the court. My name's Teresa Grigsby. I'm here today on behalf of the Erie County Corrections Officers, the sheriff, and the Board of County Commissioners. Did you file a 20HA letter or have you in any way invoked a lawler? No, Your Honor. We believe we've responded to all of the arguments made in plain and spree, but there are a couple that I'd like to highlight today, and they focus primarily on the excessive force claim. Before I do that, though, I would like to respond to Your Honor's questions at the very end of counsel's argument. Just for clarification, you represent the curve, basically? Yes, sir. Okay. Yes, sir, I do. So you don't represent anyone involved in the deliberate indifference claims? No, only to the extent that the sheriff's been sued in his official capacity on that aspect of the Monell claim. And on that point, Your Honor, I would like to clarify that the sheriff's policy was to defer to the medical judgment of the contracted health care provider with respect to identifying what medication should be administered in that medication plan. I believe that is a reasonable policy. There was no written policy in any form that would say that any type of medication is banned or barred. When you say no written policy in any form, you mean even with regard to the health? It is my recollection that there is nothing in writing that indicated that any particular class of medications would or would not be used. I don't want to be quoted on that, however, because I did not focus on that as much as my colleagues have done. But I do want to say, as to the county defendants, their policy was to defer to the health department. And the sheriff testified unequivocally that he had no separate policy by which any class or type of medications would be strictly prohibited in the jail setting. So with that little underbrush cleared away, I will return now to the excessive force issues that I think are most significant for my folks. I would like to address first the issue of the objective reasonableness of the takedown maneuver by Officer Carr. We have a situation here where at 2.30 in the morning, an admittedly defiant, non-compliant prisoner ignored repeated commands to cease his disruptive behavior. He was banging his food tray on the door. He was pounding on the door. He would momentarily stop but then resume. After this went on for a period of time, Sergeant Hamernick approached the cell, and this is where our video picks up, in an effort to quell the disobedience, restore order to the  And he made the reasonable decision, which would be common under these circumstances, to remove the individual from the cell and place him in the restraint chair. And he needed the assistance of other officers to do that. Officer Carr is the one who entered the cell first. And the video shows that he did so in a very calm, professional way. Nothing in the video or the testimony indicated that he was emotionally inflamed, that he just simply wanted to wantonly inflict violence. No, he entered the jail cell and he told Wyde twice to turn around so he could be cuffed. Again, he disobeyed the order to do so. This was after he had disobeyed at least six orders from Hamernick to place his hands through the food chute so that they could be cuffed. And then he was standing within inches of Carr's face and he verbally opposed him, and as I said, ignored repeated orders by Officer Carr to turn around so he could be cuffed. So under these circumstances, Carr was left with really no other choice. He did the same thing as any reasonable officer would do under those circumstances. He utilized the standard trained upon takedown maneuver to bring Wyde to the floor. Plaintiffs have submitted no evidence to show that the takedown maneuver under these circumstances is an unreasonable form of conduct in the jail setting. This was, after all, low-level, non-lethal, weaponless use of force. So what was the need to intervene? He was in that room by himself, right? He was in a cell by himself, but it's 2.30 in the morning. He's causing a disturbance, which he admits in his complaint that he was causing a disturbance in the jail, and the need was to restore order. This court issued a decision in Caldwell v. Moore in which the court said that inmates simply cannot be permitted to decide what orders to obey and when to obey them. Somebody has to exercise authority. Somebody has to exercise control. In that case, the court rejected the idea that the officers should have talked more or tried to negotiate. Those kinds of decisions about how to restore order are ones that cannot be second-guessed. In that case, they did not second-guess the far more serious use of force of a stun gun and a straitjacket. No, what Officer Carr did here was a reasonable way to restore order because Wyde's defiance and disobedience made it necessary to restore order, and a hands-on encounter became inevitable. This was not what plaintiff would describe as passive resistance because the Sixth Circuit case law on this point is clear. Active resistance can exist when there's verbal hostility or a deliberate act of defiance, and that's what we had here, repeated deliberate acts of defiance. It's also noteworthy, I think, that none of the officers understood at the start of the incident or recognized why to be undergoing a psychotic event induced by Xanax withdrawal. We believe that there's no fact question here on the reasonableness of Carr's use of force because number one, there is no dispute about the circumstances preceding the use of force. Number two, there's no dispute through expert testimony that this maneuver was appropriate under these circumstances. Number three, there's no dispute that after he hit the floor, Wyde was aggressively, vigorously fighting. That can be seen in the video, and that would certainly be inconsistent with the notion that the takedown was unduly harsh such that he was injured in a way that he couldn't physically react. There's also no dispute that Wyde physically displayed no injury. That is seen both in the cell video and the chair video, and there's no dispute that when he was taken to the emergency room for treatment a few hours later, his presentation at the ER was described by the admitting physician as atraumatic. I was looking through something in my file, and I failed to note that your light is on. I'm sorry? Your time is up. Thank you, Your Honor. May it please the Court, my name is Frank Scaldone, and I represent the Health District defendants, Nurses Burgess and Cromwell, as well as Dr. Eldridge. We ask this Court to affirm the lower court's grant of summary judgment. A plaintiff has accused Nurse Burgess of deliberate indifference to medical needs in two ways. One was failing to inform Dr. Eldridge of a Xanax prescription, and the second one was to not take further action regarding plaintiff's decline as his health declined in the jail. With regard to the first issue, the District Court correctly held that based on, and first there is, Mr. Wyde did testify that he requested, or that he informed that there was a Xanax prescription. Nurse Burgess said that she was unaware of that request, and if it was made that she would have noted it on the intake form or the appraisal form. The District Court found that based on all of the things that Nurse Burgess did, that this was not deliberately indifferent to a serious medical need. First, she documented the plaintiff's pharmacy, the different medications that he was on, the Opana, the Oxycodone, Neurotin, the Triptyl. She contacted the Walmart pharmacy, verified the prescriptions. She contacted Dr. Eldridge for the medication order. She also facilitated Officer Beatty to accompany her to plaintiff's cell so that she could convince, or that they could convince him to continue to take his medication, which he refused to do on two incidents. So based on that, the Court found in light of everything she did document, she did confirm and relay to Dr. Eldridge that it's not reasonable to infer that her failure to document the Xanax prescription rises to the high level of deliberate indifference. I'm sorry, but what about the fact that we have to accept his testimony that he told her? Even including that, the high level of the standard for deliberate indifference, even considering that, considering all of the things that she did do, does not rise to the high level of culpability for deliberate indifference. That's our position with regard to that issue. And you're not making any argument based on Lawlor? I mean, the case law that we cited, I think Triazi, I think, encompassed that, but we did not cite Lawlor. With regard to the failure to take... What standard do you think applies? Is it the conscious disregard? I think that based on, you know, I need to review a little bit more carefully the Lawlor decision. We've argued, we argue that under any standard that is going to summary judgment is appropriate because of the high level for deliberate indifference. I would like to believe that the Lawlor standard applies to the previous standard because obviously it is beneficial to her client. When the hospital released him after he went to the hospital from the jail, I'm looking at their discharge medications. They also don't prescribe Oxy. Is that right? They do Tylenol, 1000, Motrin, those types of things. I believe that is correct. And at that point he was... And they also don't prescribe Xanax, right? Correct. And also at that point he was sufficiently, how do you say, at that point that he had already gone through withdrawal and was clean at that point or beyond the withdrawal symptoms. The second part of the allegation against Nurse Burgess about not taking additional action when plaintiffs started to decline and making complaints, she did respond by taking his vital signs which were slightly elevated, but she noted that the plaintiff that day had refused his medications at least two times and that could account for the slightly What about the fact that by then he was going through something? I mean, wasn't he saying that he was hallucinating, describing seeing monkeys or other things? I mean... Yes. And that's part of... Wouldn't that objectively put her on notice that... That he's withdrawing from opioids. What she didn't know was that he was also... Basically the same type of withdrawal symptoms for withdrawing from opioid would be the same for withdrawing from benzos. So... But if you add the fact that we have to presume to be true that he told her that he was taking Xanax, why isn't that enough? Again, based on all of the things that Nurse Burgess did do, does not rise to the... When taken together, even assuming, as we must, assuming the plaintiff's allegation is correct or testimony is correct, it does not rise to the high level of deliberate indifference. Did he have an active prescription for Xanax? I did not see that in the record. His testimony is he certainly did. Did he or didn't he? You all could have checked that. Your friend on the other side says it's in the ORS report. I'm scanning through the record. I haven't seen the ORS report, but I don't know where it is. Yeah, I don't want to represent the court something I don't know that... So no one checked that? Neither side? Even if he had the prescription, it's still the same analysis is going to apply. I understand that, but if he didn't... I would think if I was in your position, I would find out. I would be happy to supplement the record with that or supplement with... I think that had to be presented to the district court, unless my colleagues can correct me. But I don't think you can do that here. Turning to Dr. Eldridge, he's accused of prescribing an opiate withdrawal protocol without reviewing medical records or examining him personally. There's no law that clearly establishes that that's required or that that's a constitutional violation. Dr. Eldridge only had the information relayed to him by Nurse Burgess, and he only knew those particular drugs were being prescribed. What about the pain medications? If somebody comes in and they're legitimately on prescription opioids for pain, can you just figure that ibuprofen's going to do it, even if you had gabapentin? I mean, is that enough? Well, I think that that's going to be a determination by the physician on what would be appropriate as a substitute for opioids. And it wouldn't be a matter of constitutional law, as this court's generally held, that doesn't get involved in the medical determinations that sound in state tort law. Well, is there any testimony in the record that there was a determination by Eldridge that these substitutes would be sufficient to address his pain? I'm not aware of the extent of what the medications that were prescribed would offset that. This was in the context, obviously, of him going through high doses of opioids and later found Xanax. I mean, I thought his answer was just, you know, we're not allowed. Not that this should have been sufficient or anything. In terms of opioids or benzos? Pain. I'm talking about pain. They generally do not take prescriptions. Ultimately, it's the discretion of the physician. But they generally do not prescribe opioids to people that are in the jail. Do they ever prescribe it to addicts? I thought every jail had a policy of not prescribing opioids to addicts. Is your jail different? Not that I'm aware of. Generally, they're not prescribing. There's no absolute ban on it. Again, it's the discretion of the physician. But that's the testimony in there I can tell is that it's not generally prescribed. Did he have a heroin problem? Am I wrong? I didn't see that. I know he had a cocaine problem, alcohol problem, high levels of Xanax or benzos and perhaps some others. Those discharge papers would be wrong if it says heroin. I wouldn't say that. It wouldn't surprise me if that were also correct. No further questions. Your time is up. Thank you very much. We ask the court to affirm the lower court's grant for some re-judgment. Thank you for your time. I will supplement the record to establish the Xanax prescription. Dr. Bauer specifically testified. I don't know if you can do that. Not supplement the record. I will point to the place in the record where that is apparent. Where is that? Some of it is in Dr. Bauer's report. It's in his testimony. There were reports presented to him asking him about the levels of Xanax that were being taken and the levels of opioids that he was taking at the same time. He said, well, I wasn't the one prescribing the benzodiazepine. I was prescribing the opioids. When there might have been a gap at some point where he wasn't receiving the Xanax and why didn't he go through extreme withdrawals at that time. Bauer said, well, the opioids kind of cover some of those same neuroreceptors from the Xanax. There was a lot of discussion about it. It's in the record. It's for anxiety. Gabapentin handles anxiety. It can't handle an abrupt withdrawal of Xanax or benzodiazepine. Even the French case that they cited, the person was tapered from the benzodiazepine. Do you agree Gabapentin handles anxiety? I'm not clear on that. He was prescribed that for nerve pain. But he wasn't even allowed to have that in 2019 because it was a controlled substance. Is your answer the same, when the hospital was prescribing after whatever, five days? How soon after did he go to the hospital? On April 1st after the, well, they made him sit in a restraint chair for seven hours, defecating on himself all night. But then he was given Ativan, a benzodiazepine. He was given morphine for pain in the hospital. I don't know why that was said. And as far as the policies, it's got to be, you can't admit to something under oath in discovery and then deny it. And I'll read the admissions, and this is going to be record 37 and 36, I believe. And now it says I admit, this is a request, admit the health district had a policy in place from May 27th to April 2nd, 2017, prohibiting any inmate of the Erie County Jail from receiving any benzodiazepine prescription medication while housed in the facility. The response is admit any, under any circumstances. So I don't know why the judge found that there was some separate policy that were in, to provide benzodiazepines in the jail because there wasn't. And the same thing with opioids. The same wording. I'm not sure. How does that help you? Because a complete ban on, like, for example, in the Clutter's case, a complete ban on a specific class of drugs or opioids or narcotics is unconstitutional. It's a complete denial of medical care. In a prison? Are you sure? In a jail. Clutter's case didn't deal with. Clutter's. It didn't deal with, I'll look at it, but it didn't deal with drugs, did it?  It dealt with oxycontin and an oxycodone. Give me the site. It's a Southern District of Ohio case. I've cited it in the brief. Oh, it's not a six or eight case? No, it's not. But the Huk, the Richmond v. Huk also, even in Brawner, the person had three controlled substances. Gabapentin, Suboxone, and I believe it was a benzodiazepine, Clonazepam. In that case, the doctor didn't review the record. It wasn't clear whether or not he was supposed to have reviewed the intake form that said that she was supposed to have gotten them. And they were denied him, and that was considered to be a constitutional violation without qualified immunity. So there are a number of cases that I've cited with regard to that. I'd also like to state that the Hammernick ordered Mr. Wyde, he knew about Mr. Wyde's withdrawal. He knew he was withdrawing when he ordered him out, and he said he removed him out of the cell to protect himself for his own safety. That's why he was taken down in that brutal fashion and no other reason, not for order, not for punishment. That was his testimony. And the other, he was aware because also he was saying incomprehensible things before, after, and during the extraction. Hammernick testified to that. He knew this person was in crisis, and he said that was a medical condition withdrawal. He knew that, but he let him sit in, put him in that chair instead of calling the nurse before the extraction or the doctor or just calling an ambulance, and just let him sit in his mess and have that takedown. And that within two seconds he was taken down. The jail policy said that when you have a passively resisting person who won't exit their cell, that you're supposed to first do a chemical agent, even if you want to take them out, and then you're supposed to do a control hold. And if those don't work, then you can do a takedown because you're doing a takedown of concrete floor and a cinder block barrier. And in those close quarters, there's a very serious imminent threat of harm to a person's head if you're going to take them down and smash them on the floor, which is exactly what happened on the video. You can see the manner in which it happened within two seconds of Kerr entering the cell, and there's no verbal defiance, just a confused person in crisis that doesn't even understand the words that are being said to him. And Hammernick knew that. Kerr knew it. He put it in his own report. And I guess my time is up, and I would just ask this court to reverse the district court's granted summary judgment in favor of the appellees. Thank you. I appreciate the arguments. All you have given, and we'll consider the case carefully. Thank you.